**REPUBLIC STEEL CORP et v AMALGAMATED ASSN OF IRON, STEEL & TIN WORKERS OF NORTH AMERICA et**

Ohio Common Pleas, Trumbull Co

Decided June 21, 1937

Harrington, Huxley & Smith, Youngstown, and Guarnieri & Secrest, Warren, for plaintiffs.

W. B. Kilpatrick, Warren, Lee Pressman,

Toledo, Edward Lamb, Toledo, Joseph Kovner, Toledo, William Lavelle, Toledo, for defendants.

## OPINION

### By GRIFFITH, J.

This is an action by the Republic Steel Corporation, and Trumbull Cliffs Furnace Company, of Warren, Ohio, against the 'Amalgamated Association of Iron, Steel and Tin Workers of North America, Trumbull Lodge No. 73, and seventeen other defendants sued with it, as the caption indicates.

The two plaintiffs are corporations owning and operating two steel plants, and a blast, furnace for the manufacturing of iron.

The claim is that the defendants are engaged in organizing, promoting and prosecuting a strike against the plaintiffs' plants; that they, and their associates, have caused large numbers to congregate about the plants; so that entrance to the plants has been obstructed; that they have been, and now are armed with clubs, pipes, baseball bats, blackjacks, and other weapons, and are engaged in attacking, and intimidating persons attempting to enter or leave the plants; that they have prevented employees of plaintiffs from going to their homes, and made it necessary for them, if they desire to continue their employment, to remain continuously within the plants for their own safety and protection; that they have molested, by threatening, and actual acts of violence, those attempting to take materials into the plants; that they have shot at pilots of aeroplanes with high powered rifles; and that they have prevented the movement of trains in and out of the plants.

The plaintiffs say that the local police, and other law enforcing authorities have failed to protect them, and pray for an injunction restraining the defendants in such illegal conduct, and that the court fix and determine the number of pickets that may be on duty at any point at any time.

The parties to this suit are in the throes of a gigantic steel strike, national in its scope. The situation is fraught with possibilities of grave injury, and requires prompt decision.

As always, in like struggles, the third party in interest, the general public, suffers if it fails to sufficiently control, as it rightfully can, the activities of both parties.

It is not necessary to go into a lengthy dissertation as to the facts disclosed by the testimony of the thirty witnesses, who have appeared and testified in this hearing.

The plaintiffs charge that the defendants, and those acting with them, are now armed with pipes, baseball bats, blackjacks, and other weapons.

What is the proof?

Mr. Mayo, one of the defendants, who is a sub-regional director of the CIO, says that he has seen the pickets with pipes, and clubs in their hands;

Gus Hall, an organizer for the SWOC, another defendant, testified, on cross examination, that he had seen baseball bats, and sticks, in the hands of the pickets; and

Of like tenor is the testimony of Mr. Galloway, Mr. McCune, Mr. Gracier, Sheriff Hardman, and Deputy Sheriff Rose.

The evidence is replete in support of the plaintiffs' charge in this respect.

The plaintiff says that the defendants have molested the employees of the plaintiff by threats, or actual acts of violence.

What is the proof?

Mr. Charles Burnett testified that he was knocked down at the front of the Republic Steel office by Dave Williams, who was on picket duty;

Mr. Joseph Burns, on his way home from his work, was taken into CIO headquarters, and questioned by Gus Hall, one of the defendants, and then taken to North Tod avenue by three pickets, stripped of his clothing, and slugged, because he refused to sign up with the defendant organization;

Dr. Thomas saw two hundred pickets rush at an automobile near the plant, and then saw the car with two bullet holes in it immediately thereafter; he saw Sylvester Johnson the victim of an attack on Pine street, by pickets;

Mrs. Beagle, whose husband remained in the mill, told of five men coming to her home, and warned her to immediately get her husband out of the mill;

Mr. Musgrove, who waded through swamps and water, to get back to his work in the open hearth, was captured by pickets, his hands tied behind his back, he was threatened to be hanged, his pants and shirt cut off of him by an Italian man, a picket, he was greased with grease from a Ford hub cap, and on his body the word "SCAB" was printed, he was slapped in the face, and struck on the legs with a gas pipe, all at the hands of men on picket duty;

Maxwell Heath likewise, in his endeavor to return to the mill, to work, was captured by some twenty pickets, taken to the

CIO headquarters, and thence by auto to his home on Palmyre road, his shirt was torn, and he was warned not to go back to the mill.

This case abounds with testimony of assaults, threats, warnings, and brutal and degrading attack on the part of the pickets.

Must the citizens of our community like these mentioned, who are heads of families, some of them home owners, with children and dependents, be the objects of such lawlessness, with the consent and approval of the courts?

All this testimony is uncontradicted; not a witness has appeared to deny this reprehensible conduct, of which these men were the victims.

The real interests of labor are not promoted by resorting to violent manifestations, such as disclosed by these witnesses.

What about the charge that the defendants have prevented the movement of trains in and out of the plants?

'Mr. Baker, the train master for the Erie railroad, said he had been• unable to move cars in or out of the Niles plant, because of the pickets who were armed with baseball bats, clubs, iron pipes and steel rods;

The sheriff said he could not move trains in or out without inciting a riot, and that was what he has been seeking to avoid:

Mr. Emch, the B. and O. train master, said he could not get trains in or out, that he tried to move cars but was met with resistance from pickets, armed with clubs, that the tracks had been obstructed with ties, rails loosened and switches filled with bricks and stones.

The defendants have testified that a committee of seven has complete charge of the strike, and that this committee has appointed captains, and instructed them to see that everything is peaceful and orderly, and asked the men on picket duty to lay aside their clubs. Many of the defendants have testified that they do not condone violence for the accomplishment of their purpose.

Taking into consideration the facts and circumstances in evidence, it is established beyond all doubt that some of the defendant unions are afflicted with members who, in and about the promotion of union interests in this strike, of their own volition, at various times and places, have perpetrated threats, force, assaults and intimidation.

If the defendants can not restrain their members, it is the duty of the court, in law enforcement, to do so; therein serving the best interests of the defendants no less than those of the plaintiffs, nor overlooking those of the third party, the general public.

The gentlemen who are defendants in this case, many of whom are organizers, or officers of the union, are men of more than ordinary intelligence; and, while they do not condone violence, but, in fact, abhor it, yet the defendants were passive, and with full knowledge of existent conditions: the court must conclude that they passively assented to all that was done by its members. The acts of these pickets are the acts of the defendants. The pickets were subject to the discipline of the defendants. The defendants put these pickets in motion, and are responsible for their acts, and must be held responsible for whatever they do.

To permit a man to be a law unto himself is a call to anarchy. This is true whether the man be an industrial baron, or a trade unionist.

If the tendency of unionism is to produce better citizens, and more efficient, competent workmen, and better the working conditions of labor, as I believe it to be, then unionism will succeed and prevail, no matter what forces or combinations may be arrayed against it; but, if it seeks to destroy property by violence, to assault, intimidate and coerce its fellowmen, in order to assert itself, it will fail ignominiously.

The defendants have testified that the plaintiff's men in the plant have assaulted their members. They have described the assault that occurred at the time of a peace meeting held at the plaintiff's office, when the plaintiffs' men threw bricks, bolts, nuts and other objects at these defendants; and even at the sheriff, who was present at the meeting. Mr. McKeown testified how he and his men had tolerated missiles, and attacks of the men in the plant; and that his men, at all times, co-operated with the law enforcing officers in the preservation of peace and order. Mr. Gracier revealed how missiles· had been thrown at him and the men outside, from men in the research department of the plant. Mr. Williams, Mr. Montgomery and· Mr. Byland each testified about the brutal assault which was inflicted upon them by the company police, on the night the strike was called, merely because these three men sought to have others who were in the plant go out on strike with them; how they were beaten with black jacks, and driven from the plant at the point of guns.

Two officers of the city police force of

Warren testified to the conduct of the plaintiff's men inside of the mill, who had called the officers libelous epithets, and inciting vulgar names. Mr. Rose, a deputy sheriff, likewise told of how the men in the plant had called him, and the sheriff unspeakable names; and how the men on picket duty had, at all times shown him the greatest respect.

Miss Matilda Armstrong, who was employed at the Niles plant, revealed how she was refused to be let out of the plant at the time the strike was called; and how she was detained there until noon of the next day.

Mr. VonTol, one of the men who walked out of the Niles plant at the time of the strike, and went on picket duty thereafter, related how his boss at the mill had warned him to leave town as quickly as possible. Mr. Wines likewise described the unwarranted assault upon the defendants by the plaintiff's men, at the time of the peace meeting held at the plant office, and how he induced the defendants to back away, and remain orderly, and refrain from conflict with these aggressors.

In the face of all this mass of evidence, it is clear that lawlessness has run rampant in our county since the night of May 26.

The defendants say that the acts of the plaintiffs themselves have been provocative of the defendants' conduct.

Can it be said that because of the misconduct of the plaintiffs' police, or men in the plant, that that called forth the defendants to knock down Mr. Burnett; and send Mr. Zipperer sprawling to the ground; and grease Mr. Musgrove, and label him "SCAB"; or summon them to assault Mr. Heath, and threaten him as they did?

The men who are working in the plant have a right to walk out the front gate of that plant, and go to their homes free from assault, intimidation or coercion by anyone. They have a legal right to return to their work with equal freedom and protection. They need not wade swamps, ford the Mahoning river, or jump fences like a thief in the night, in order to go to their work at the Republic steel plant.

The Supreme Court of this state has spoken very plainly on this matter in 108 Oh St., at page 80, where it says:

"Acts or threats, direct or indirect, made by pickets to workmen employed by their former employers, or to their families which tend to amount to coercion or duress, or tend to substitute the will of the strikers for the will of those whom they approach, in persuading employees to leave their work or in inducing others not to seek employment with the strikers' former employer, are unlawful and subject to injunction."

That these defendants may stop work by common agreement, for the purpose of obtaining a change in the conditions of employment, is admitted.

No strike of any magnitude can be successfully carried on, or prosecuted without picketing. The picket is not only the eye, but the right hand of the strike.

It is the manner of picketing of which the plaintiffs complain in this case.

Strikers shall not be restrained from recommending, advising or persuading others, by peaceful means, to quit work; strikers may go to the very line between the lawful and the unlawful; and may use art, eloquence, oratory, and logic to accomplish persuasion, indulge in fair, vigorous and repeated argument. They may peacefully intercept prospective employees, making statement of their claims, to argue their case, and do all other things a citizen, or class of citizens may lawfully do to win converts to its cause; but they can go no farther.

They may not resort to force and violence.

Neither may the Republic steel company resort to force or violence in its conduct.

The parties to this suit seem to forget that aggression incites retaliation, and violence breeds violence. There is a duty on the part of both parties to this action, and that is the supreme necessity of maintaining law and order as the only basis of society.

Without law and order you have communism, which is a hateful thing, a menace to peace and to orderly government.

Communism of combined wealth is no less dangerous than the communism of oppressed poverty and toil, which, exasperated by discontent, attacks with wild disorder those against whom it has a feeling.

Equality of justice demands that in a controversy the rights of all parties be scrupuously maintained; the right of workmen to be employed, irrespective of union membership, must be maintained; the right of the employer to conduct his business without illegal interference must be upheld, and legal means employed by strik-

ers must not be curtailed, including the right of peaceful picketing, and peaceful persuasion of employees not to accept work with the employer in question.

There should be a way of reconciliation between these parties, to prevent the distressing results that we are now experiencing.

When reconciliation is beyond the reach, then dispassionate arbitration of the conflicting claims is in order; but over and above reconciliation and arbitration is the idea of enforcement of law, and its testing is immediately at hand.

The equitable jurisdiction of this court has been invoked by the plaintiffs.

The action of a court of equity is uniform upon all parties in the controversy before it, and is impartial in its application, and reaches to the protection of the rights of all who come before it. The crumbs of the most humble citizens are entitled to its protection, the same as the amassed wealth of the mightiest. Its remedies are equally available to all such, and must in such proceeding be impartially applied upon all. The law acts uniformly, and applies to the agents and police of the plaintiff, as well as to the pickets of the defendants.

When a court of equity has obtained jurisdiction over some portion, or feature of a controversy, it may proceed to decide the whole issues and to award complete final, equitable relief which is necessary to meet the ends of justice.

Equity delights to do justice, and not by halves.

It is a universal rule governing a court sitting as a chancellor, that whatever may be the nature of the relief sought by the plaintiff, the equitable rights of the defendants growing out of the subject of the controversy in question will be protected. The maxim which declares this important and far reaching policy, "He who seeks equity must do equity," expresses a cardinal principle, and is one of the oldest in equity jurisprudence. It is applicable to all classes of cases whenever necessary to promote justice, and this principle is of especial force as applied to the facts in this case. Then there are those two kindred maxims, "He that hath committed inequity shall not have equity" and "He who comes into equity must come with clean hands."

The evidence in this case, which has been summarized conclusively, shows that the plaintiffs' hands are not clean; that

the agents of the plaintiffs have indulged in slugging workmen leaving the plant on the night of the strike, illegal assaults upon the defendants' pickets, false imprisonment of employees of plaintiffs, threats, and the application of libelous epithets upon the defendants, as well as upon law enforcement officials.

It is the province of this court to balance the conduct of the plaintiffs and the conduct of the defendants; and whether they be in balance or out of balance, the conduct of both sides, as revealed by the evidence, is taken into consideration in the pronouncement of this final order:

The defendants are hereby permanently enjoined and restrained from doing or saying any of the following acts and things, to-wit:

(A) From arming, or permitting any of their pickets being armed with clubs, pipes, baseball bats, blackjacks, or other weapons;

(B) From obstructing any streets, or highways within the county of Trumbull, or interfering with persons in the lawful use thereof;

(C) From inducing by intimidation, threats, abuse or violence, any person who is now, or may hereafter become an employee of either of the plaintiffs, to leave plaintiffs' employ; and from preventing, by intimidation, threats, abuse or violence, any person from entering plaintiffs' employ;

(D) From, in any manner, interfering with those attempting to move freight trains or trucks to and from the plaintiffs' plants;

(E) From damaging any of plaintiffs' property.

Coming now to the question of fixing and determining the number of pickets that may be on duty at any time during the continuance of this strike, the court fixes the numbers as follows:

(1) At the main gate of the Niles plant, not more than twelve (12);

(2) At the main gate on Pine street, at the Warren plant, not more than eight (8);

(3) On the sidewalk, on the West side of Pine street, between the main gate and Walnut street, not more than twelve (12);

(4) At the railroad entrance to the Warren plant, not more than twelve (12);

(5) At the open hearth entrance on Pine street extension, not more than twelve (12);

(6) At the open hearth road entrance, off South Main street, not more than twelve (12);

(7) At the blast furnace gate, on South Main street, not more than six (6);

It is further ordered that all pickets between Walnut street and the B. and O. entrance, keep clear of and off of the west half of the Pine street pavement, at all times.

As to the number of pickets at other points outside these plants, no special rule can be laid down in detail, no special rule or point may the number be so great as to prevent access to the plant, or, in itself, to constitute a threat of physical force.

This order with respect to the number of defendants' agents, or pickets, can be amended when necessity is made to appear.

It is the further order of the court that the plaintiffs be permanently and perpetually enjoined and restrained from doing or saying any of the following acts and things, to-wit:

(A) From permitting any of its agents or workmen throwing bricks, stones, bolts, nuts, rivets, or any other missiles at the defendants, or their agents, or pickets, at any time or place;

(B) From permitting any of its employees, or representatives directing any epithets, or insulting names at the defendants, or those acting with the defendants;

(C) From inducing by threats, abuse or violence any workmen in the plants, to remain therein;

(D) From permitting any of its police officers to assault, attack, or manhandle any former employees of the plaintiffs who may now be engaged in the lawful picketing of the plaintiffs' plants;

(E) From threats of violence as against the defendants, or their families.

(F) From moving any freight trains or trucks, or permitting any other agencies from moving any freight trains or trucks in or out of any of the plants until six (6:00) o'clock A.M., Wednesday, June 23, 1937.

It is the further order of this court that this pronouncement becomes effective immediately; and this opinion is filed with the clerk of this court for spreading upon the journals thereof as a final and complete determination of the issues in the case.

The function of this order is protection, and not a shelter for aggression.

Exceptions may be noted for all parties adversely affected by this decision.